UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JESSICA TURNER on behalf of her minor
child J.T.,

                Plaintiff,

    -against-

NORTHWOOD SCHOOL,

                Defendant.

No. 8:23-cv-132 (GTS/DJS)

**COMPLAINT AND JURY
DEMAND**

Plaintiff Jessica Turner on behalf of her minor child J.T., by and through her

attorneys Kaufman Lieb Lebowitz & Frick LLP, alleges as follows:

## INTRODUCTION

1.     This action arises from Defendant's discriminatory refusal to permit a

boarding student to attend school with the assistance of a service dog, and its decision to

indefinitely exclude her from its campus because she is disabled, in violation of state

and federal law.

## PARTIES

2.     Plaintiff Jessica Turner is a resident of New York and the mother of J.T., a

minor child.

3.     Defendant Northwood School ("Northwood") is a private, coeducational

boarding school located in Lake Placid, New York. Northwood is a not-for-profit

organization registered with the Charities Bureau of the New York State Office of the

Attorney General pursuant to Section 172 of the New York Executive Law and an

education corporation chartered by the New York State Board of Regents in accordance

with Section 216-a of the New York Education Law.

**JURISDICTION AND VENUE**

4.      This action arises under the Americans with Disabilities Act (ADA), the Fair Housing Act (FHA), the New York State Human Rights Law (NYSHRL), and the New York Civil Rights Law.

5.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(4), and 1367(a).

6.      The acts complained of occurred in the Northern District of New York, and venue in this Court is proper under 28 U.S.C. § 1391(b).

**JURY DEMAND**

7.      Plaintiff demands a trial by jury in this action.

**FACTUAL ALLEGATIONS**

***Background on J.T. and Northwood***

8.      J.T. is a 12th grade student at Northwood, a residential boarding school that she has attended since she began 10th grade in the fall of 2020.

9.      J.T., who is biracial, attends Northwood with the benefit of a scholarship that covers almost her entire tuition.

10.      J.T. loves Northwood and has thrived there. She has been particularly involved in the arts community, and has pursued visual arts, costume design, digital art, dance, and music. J.T. plays many instruments, including the piano, bass guitar, flute, and *gugin*, a traditional Chinese string instrument. Last year she was nominated for and received an award recognizing her leadership skills.

11.      J.T. is heavily involved in the school community. She is a member of several student groups, including musical groups and the Multicultural Student Club.

and has many close friends. She attends school sports events, works in the school kitchen, and performs at school functions.

12.     Academically, J.T. generally gets A's and some B's, and has previously been on Northwood's Honor Roll.

### J.T. Suffers from a Disability and Requires a Service Dog

13.     When J.T. was 11 years old, she was seriously injured in an accident. Her arm was severely lacerated and had to be surgically repaired, causing permanent nerve damage. While she was at the hospital, J.T. overheard a doctor say she "almost died."

14.     The accident was psychologically traumatizing for J.T., and she continues to live with the effects of that trauma.

15.     In April 2021, Northwood informed Jessica Turner, J.T.'s mother, that J.T. had had a "seizure" and had been taken to the emergency room.

16.     Ms. Turner promptly arranged an appointment with Dr. Anna Alshansky, a pediatric neurologist. Dr. Alshansky diagnosed J.T. with Psychogenic Nonepileptic Seizures ("PNES"). This condition causes episodes that mimic epileptic seizures. "Psychogenic" means that the seizures have psychological rather than organic causes. PNES is often a manifestation of trauma.

17.     J.T. has also been diagnosed with Post-Traumatic Stress Disorder (PTSD) and Generalized Anxiety Disorder.

18.     J.T.'s PNES episodes can vary in length from 30 seconds to over an hour. The episodes typically occur to some degree every day, and sometimes multiple times per day. During more severe PNES episodes, J.T. shakes or convulses, zones out, feels pain, and suffers memory loss. She often falls asleep from exhaustion during or after

these episodes. The frequency of these severe episodes varies: sometimes they occur a few times a week, sometimes only a few times a month.

19.     Her seizures substantially limit J.T.'s ability to engage in major life activities, including concentrating, forming memories, learning, reading, thinking, communicating, working, and sleeping.

20.     In summer 2021, J.T. started regularly seeing a trauma therapist, Kelli Robbins, LCSW. Based on J.T.'s diagnoses, Robbins recommended that J.T. get a service dog to aid her in recognizing and recovering from her seizure-like episodes.

21.     Ms. Turner began researching breeders and trainers for service dogs.

22.     J.T.'s service dog—a male Labrador retriever named Juno—was born in February 2022. Now almost a year old, Juno has been individually trained to perform seizure alert and response. Juno can detect through pheromone changes when J.T.'s heartrate rises and will signal her to sit and calm down. When J.T. does have a seizure, Juno is trained to provide pressure therapy in order to interrupt the seizure. Juno has also passed his "canine good citizen" and "public access" training. And Juno is training to perform additional tasks including "counterbalance" (helping guide J.T. to safety when she gets dizzy or disoriented) and "behavior interruption" (reminding J.T. to stop trauma-induced behaviors such as skin-picking).

23.     Juno is very well-behaved and trained. He does not bark or growl and is friendly to everyone.

24.     Juno has lived with Ms. Turner for most of the past year, except for two months of intensive residential training in fall 2022. When J.T. is not at Northwood, Juno accompanies her everywhere.

25.     J.T. has found that her seizures are reduced in frequency and duration when Juno is present to help her. Her PTSD and generalized anxiety symptoms are also markedly improved when she is with Juno.

### *Northwood Refuses to Accommodate J.T.'s Service Dog*

26.     J.T. and Turner first informed Northwood of Robbins's service dog recommendation during the summer of 2021, months before Juno was even born.

27.     On September 1, 2021, school psychologist Tara Wright reached out to Turner "to talk about accommodations for her condition, including a service animal for her seizure disorder."

28.     Ms. Turner responded that Robbins would write a letter in support of her recommendation, but reiterated that the dog would not be ready anytime soon. Ms. Turner added that she had witnessed J.T.'s seizures at home and they "are very disturbing."

29.     On September 4, 2021, John Spear, Northwood's Assistant Head of School for Student Life, followed up with Turner. Spear said that "[t]he idea of having a service dog on a student dorm hall is new to me and to Northwood, and I imagine there are several questions that will arise as we consider this."

30.     On September 7, 2021, Turner sent Northwood a letter from Robbins. Noting that J.T. "suffers from non-epileptic seizures," Robbins recommended a "service dog" to, among other things, "provide seizure support along with physical support to help keep [J.T.] safe."

31.     In early October, Turner and Spear spoke via videoconference. Spear said he had spoken to another boarding school that had allowed a service dog and said it worked out fine, and claimed he needed to do more research.

32.     During the fall 2021 semester, J.T. struggled with absences and procrastination due to frequent PNES episodes.

33.     As a result, on December 8, 2021, J.T. had a meeting with Spear and her academic adviser, Noel Carmichael. As Spear later reported to Ms. Turner, the meeting concerned ways "to help support [J.T.] with her attendance," and went "very well." In this meeting, J.T. "mentioned that there's a new letter from a provider that recommends a service dog."

34.     The "attendance support plan" developed at the December 8th meeting laid out protocols for when J.T. "experience[s] PNES." Among other things, J.T. was told to "[c]hat the nurses or go to the nurse's office to document the PNES." If she had to miss obligations, she was supposed to ask for assistance in developing a make-up plan. All of J.T.'s teachers at Northwood were provided a copy of this plan.

35.     On December 11, 2021, Turner sent Northwood a letter from Robbins, the trauma therapist. Robbins wrote that J.T. "is experiencing severe anxiety and pseudo seizures" and "a service dog would be beneficial for her." The service dog was expected to "have a calming effect" on J.T.'s anxiety, "aide [her] to safety when having a pseudo seizure," and "alert some[one] that she might be experiencing one of these pseudo seizures."

36.     Throughout this time period, J.T.'s teachers were enthusiastic about the prospect of her getting a service dog.

37.     On January 21, 2022, Spear emailed Turner to "schedule a follow-up conversation to review [J.T.'s] request to have a service dog on campus."

38.     Meanwhile, J.T.'s PNES episodes were "increasing in both frequency and duration/intensity," according to a January 21 email from Tara Wright. Nevertheless,

J.T. was "doing better with communicating her episodes" and was excused from class when she reported her episodes to the nurses. J.T. made the Honor Roll during the spring 2022 semester.

39.   Ms. Turner and Spear spoke on February 21, 2022. Ms. Turner again requested an accommodation so J.T. could attend Northwood in person with a service dog. Spear said that was not possible. At that point, the two discussed the possibility of J.T. attending Northwood remotely for her upcoming senior year.

40.   On March 8, 2022, Spear emailed Ms. Turner, stating that he would send a plan "about allowing [J.T.] to earn her diploma while studying offsite next year."

41.   Ms. Turner immediately responded and reminded Spear that "we are not requesting a year of virtual learning. Our request is that [J.T.] is allowed to attend school with her necessary accommodation of a service dog." When Spear refused that request, Turner expressed concern that "the application window for other private schools had closed" and that J.T. would not succeed in a public high school.

42.   On March 11, Spear sent Ms. Turner a letter reiterating the denial of what he called "a seizure dog." Spear claimed that "such an accommodation will not control her seizures and we do not have the medical resources to accommodate such a serious medical condition."

43.   In the same letter, Spear also granted J.T. a six-week medical leave of absence from April 1 until mid-May "to seek medical treatment and to spend time with a dog [being] train[ed] as a service animal."

44.   On March 28, Spear sent Turner a list of four options for J.T. to meet her remaining graduation requirements. At this point J.T. "only need[ed] one full year of English credit to graduate." Accordingly, the first option Northwood offered was "to

return as a boarding student as originally planned"—on the condition that J.T. "did not bring a dog and her pseudo seizures have stopped or [are] sufficiently under control." With this option, J.T. would "take a full-time course load, which would include required English classes and electives." She would also work with an art teacher on her art portfolio and work with college counselors on her applications.

45.     The other options Northwood offered were, in Ms. Turner's view, educationally inferior. One was that J.T. take two English courses remotely with Northwood's teachers at a cost of $5,000. Another was that she take a semester-long college-level English course, at Ms. Turner's expense. The last option was to pay for a year of high school English courses with an online vendor. With any of these three options, Turner would have to pay an additional $1,000 to receive any college counseling from Northwood, and she would not be able to attend school on Northwood's campus. Spear informed Ms. Turner that if J.T. selected one of these options, she could participate in graduation ceremonies at Northwood in May 2023.

46.     Ms. Turner and J.T. did not want any remote option. Being at home alone made J.T. feel isolated and unmotivated, which worsened her symptoms. J.T. wanted to benefit from all of Northwood's educational programs, including its extracurriculars and arts programs.

47.     In mid-May 2022, Ms. Turner and Northwood agreed that J.T. would return in the fall as a full-time boarding student without Juno, who needed to attend an intensive residential training program anyway. However, as Ms. Turner informed Spear on May 7, 2002, Juno would be ready to act as a service dog by January 2023.

48.     On May 27, 2022, J.T. underwent an hour-long psychiatric evaluation with Judi Siebold, a psychiatric-mental health nurse practitioner (PMHNP). Based on this

evaluation, NP Siebold wrote a letter recommending a service dog to treat J.T.'s PNES and PTSD. Siebold's letter stated that in January 2023, J.T. "will have a licensed, service dog who will be trained to assist [her] in managing her symptoms and carry out her activities of daily living. The service dog will be specifically trained in seizure alert and response, light/deep pressure therapy and behavioral interruption." Siebold recommended that J.T. "have her service dog with her at all times."

### *Northwood Claims It Is Not Subject to the ADA*

49.    On June 1, 2022, Ms. Turner's prior attorney, attaching Siebold's letter, informed Northwood in writing that she required a service dog to remediate her disability and that she had a right under the ADA to attend school with her service dog.

50.    On June 23, 2022, Northwood's attorney responded in writing. Northwood denied J.T.'s request for a service dog, stating that "ADA provisions do not . . . control the request" and that a service dog "would be totally and extremely disruptive of the School's requirements to its other students and to the staff and the educational environment of the School."

51.    Contrary to these fears of disruption, many Northwood staff members live on campus with pet dogs, which are free to roam and are not trained to provide any services. Some of these dogs are not very well behaved and cause disruptions in class and in the dorms.

52.    Six days later, Northwood's attorney sent another letter, reaffirming that Northwood would not "accommodate [J.T.'s] request due to its existing limited and historic operations with hundreds of other boarding students on campus."

53.    On July 26, 2022, Ms. Turner's  current counsel sent a new letter to Northwood's attorney, explaining that Northwood is in fact subject to Title III of the

ADA and that its refusal to permit J.T. to attend school with her service dog violated her rights under the ADA, as well as the Fair Housing Act and the New York State Human Rights Law.

54. After exchanging several rounds of correspondence, Northwood's attorney ultimately informed Ms. Turner's counsel by email on August 11, 2022 that he did not believe responding to J.T.s accommodation request was "necessary at this time." The attorney further cryptically noted that "many unexpected or resolving events or situations may and possibly will occur between August 28th, 2022, and January 2023 at Northwood School or with [J.T.'s] educational endeavors that the School and this writer cannot now foresee."

### Northwood Places J.T. on Involuntary Medical Leave, Excluding Her from Its Campus Because of Her Disability

55. J.T. returned to Northwood in August 2022 for her senior year of high school.

56. During parents' weekend from October 6 to 8, Northwood teachers and officials, including Spear, told Ms. Turner that J.T. was doing well and was outgoing and engaged. That weekend, J.T. played bass guitar in a band performance; she had just started to teach herself the instrument a few weeks prior. Ms. Turner personally visited Northwood's Health Office and provided staff there with contact information for all of J.T.'s outside healthcare providers.

57. Throughout the fall semester, J.T. continued to struggle with PNES episodes. On 22 separate dates between late August and early November, J.T. went to the Health Office complaining of PNES episodes and related symptoms such as anxiety, exhaustion, and elevated heartrate. J.T. also visited the Health Office for other ordinary

medical issues, such as severe menstrual cramps and a rash, and when she contracted COVID-19 in September 2022. But the majority of her visits were related to PNES episodes.

58.     Because of the effects of her PNES, which were compounded by her COVID-19 diagnosis and resulting missed school, J.T. struggled with attendance and sometimes turned in work late. However, her teachers were generally accommodating and understanding, consistent with the attendance plan that Northwood developed in December 2021.

59.     On October 25, 2022, in a telehealth visit with NP Siebold, J.T. reported experiencing "increased generalized anxiety surrounding senior year academic requirements." Siebold prescribed an increased dose of Lexapro.

60.     Over the next ten days, J.T.'s overall mental health declined. On November 1, a teacher yelled at her for being late without giving her time to explain that she had had a PNES episode. Over this week J.T. experienced mood swings and multiple PNES episodes.

61.     On November 2, which was the anniversary of a close friend's death by suicide, J.T. was feeling especially sad and went to visit a male friend in his dorm for support. Spear observed J.T. making this visit, which was against Northwood's rules about visits between students of opposite sexes.

62.     On November 4, when asked to explain why she had visited her male friend's dorm, J.T. admitted that she was feeling really sad and had thought of suicide. But she also explained how the increased Lexapro dosage appeared to be to blame.

63.     J.T. never had any specific intent or plan to harm herself, and she informed Northwood of this.

64.     Northwood immediately reacted to J.T.'s struggles by expelling her from campus on an involuntary "medical leave of absence."

65.     Ms. Turner was summoned to pick her daughter up after work that evening. At that time, Spear told Turner that J.T. should be able to return to school in about a week. Northwood did not provide anything in writing to explain why J.T. was being placed on leave or what requirements it was imposing in order for her to be allowed back on campus.

66.     Starting November 4, the day her involuntary leave began, J.T. returned to her prior dose of Lexapro. Her mood immediately rebounded.

### *Northwood Refuses to Accept Medical Clearances from J.T.'s Treating Providers*

67.     On November 9, J.T. visited NP Siebold in person and informed her of the mood swings and passive suicidal ideation she had suffered since the last session on October 25. Siebold confirmed that J.T.'s Lexapro dosage should be reduced to its prior level. Noting that J.T.'s mood swings and passive suicidal ideation had "resolved," Siebold concluded that she was fit to return to school. She wrote a letter stating that J.T. "is cleared to return to boarding school" and inviting Northwood to reach out to her with "any questions [that may] arise."

68.     Ms. Turner immediately called Wright. When Ms. Turner explained that J.T.'s treating mental health provider had cleared her to return, Wright said, in sum and substance, "that's all we need" and told Ms. Turner J.T. should be able to return to Northwood shortly. Turner then emailed Siebold's letter to Wright, adding that she and J.T. "look forward to hearing back and having [J.T.] rejoin the school community."

69.     The same day, at Northwood's request, Siebold revised her letter to add more detail. Siebold explained that she had just examined J.T. in her office, decreased her Lexapro dosage, and, again, "cleared" her to return to school.

70.     The next day, with Turner's authorization, NP Siebold spoke to Dr. Cooper. On information and belief, Siebold told Dr. Cooper that J.T. was psychologically fit to return to school and was not a danger to herself or others.

71.     On November 11, school administrators and health staff met to discuss J.T.'s situation. After that meeting, Ms. Turner received a letter claiming that Siebold's note was insufficient and that Siebold's practice needed to provide "additional documentation," which the letter did not specify. Furthermore, the letter demanded a "comprehensive medical evaluation," which it did not further describe.

72.     In response to Northwood's request, NP Siebold promptly provided the notes from J.T.'s November 9th examination. Upon information and belief, nobody from Northwood has contacted Siebold's office to request additional documentation beyond those notes, which would not exist in any event.

73.     On November 14, Ms. Turner requested "more direction" on what Northwood was "looking for," noting that Northwood had been given access to all the medical records it had ever requested.

74.     Later that day, Spear emailed Turner that Northwood wanted J.T.'s pediatrician, Dr. Jack Sobrin, to review visit notes from the school Health Office as well as J.T.'s attendance records. Spear also requested that Dr. Sobrin consider a list of "specific issues that gave rise to our concerns," including her mental health symptoms, attendance issues, "regular and frequent visits to the nurse," and her untidy dorm room.

75.     Ms. Turner forwarded this email to Dr. Sobrin's office.

76.    On November 16, Dr. Sobrin provided Northwood with a letter stating that J.T. was "medically cleared to return to school." Ms. Turner also gave Dr. Sobrin permission to speak to Northwood. Upon information and belief, nobody from Northwood ever contacted Dr. Sobrin.

77.    In addition to Siebold and Dr. Sobrin, Turner also authorized Robbins, the trauma therapist, to speak to Northwood, but the school never contacted Robbins.

78.    On November 18, Ms. Turner emailed Spear again. She noted that Spear and others had reported J.T. was doing well just a month before she was put on leave, and many of the issues Spear had reported were not new. For instance, Ms. Turner inquired why Northwood had suddenly decided that J.T.'s regular nurse visits, academic procrastination, and messy room rose to the level of a safety concern. Ms. Turner emphasized that she had authorized J.T.'s clinicians to provide Northwood with whatever information it needed and did not know why Northwood would not allow J.T. to return. The email concluded by requesting "an emergency [] meeting for the creation of a 504 Plan" to accommodate J.T.'s disability.

79.    Northwood told Ms. Turner that she needed to develop a disability accommodation plan with her local public school district, the Beacon City School District. Ms. Turner initiated that process.

80.    On November 22, 2022, J.T. visited a pediatric cardiologist, Dr. Irfan Warsy. Dr. Warsy noted that J.T. "[s]uffers from PNES," was diagnosed with PTSD and generalized anxiety, and had a "[s]ervice dog to help mitigate."

81.    On a "standing test," Dr. Warsy observed that J.T. became pallid and dizzy after only a minute of standing. After several minutes, her legs were numb, her arms tingled, her heartrate was significantly elevated, and she started to get a headache.

82.     Based on this test, Dr. Warsy wrote that J.T.'s presentation was "quite reminiscent of a diagnosis such as POTS," referring to Postural Orthostatic Tachycardia Syndrome. POTS is a blood circulation disorder commonly triggered when a person stands up after lying down, characterized by lightheadedness, fainting, and rapid heartbeat.

83.     Dr. Warsy further wrote that J.T. "has a major psychiatric component to her presentation, as evidenced by her non-epileptic [seizure] activity and major anxiety."

84.     On November 27, Ms. Turner informed Northwood about the additional diagnosis of POTS. Ms. Turner also reported that Dr. Warsy believed removing J.T. from the school environment "would cause more harm/damage." J.T. could manage POTS by drinking lots of water and following a specific exercise regimen.

85.     On November 29, Spear emailed Ms. Turner regarding "where we stand regarding our requests for psychiatric and medical evaluations." Spear said that, although Northwood had received the letters from Siebold and Dr. Sobrin clearing J.T. to return, these were insufficient. Spear did not specify what additional information Northwood wished J.T.'s clinicians to provide. Spear also requested documentation regarding POTS.

86.     Ms. Turner responded the next day, November 30, explaining that NP Siebold's office had informed her that they had sent Northwood everything it requested. Ms. Turner emphasized that, to her understanding, NP Siebold had already conducted a "full psychological evaluation" of J.T. and asked whether Northwood was requesting an additional evaluation. Similarly, as to Dr. Sobrin, Ms. Turner noted that the pediatrician was "happy to address any questions" regarding J.T. Finally, Ms. Turner said she

expected to get Dr. Warsy's records soon and would forward them upon receipt. In bold-faced italics, Ms. Turner concluded that she was "***simply seeking clarity so that I can obtain the appropriate documentation that Northwood requires***."

87.    Spear responded that Northwood would "wait to receive the information regarding POTS diagnosis and treatment plan and the 504 Plan" and then "will meet to consider [J.T.'s] return to school."

88.    At the same time, Spear informed the Beacon City School District that Northwood would not "collaborate on establishing a Section 504 Plan" because it is not covered by the Rehabilitation Act.

89.    On December 5, Dr. Warsy's nurse clinician wrote a letter concerning J.T.'s POTS diagnosis, which Ms. Turner promptly provided to Northwood. The letter stated that J.T. "has a complex constellation of symptoms that include POTS . . . dysautonomia [an umbrella term describing conditions that dysregulate the central nervous system] . . . chronic fatigue . . .  near syncope [feeling like one is about to faint/pass out] . . . and brain fog." The letter continued:

> [J.T.] must be allowed to rest and have excused absences on days when she has periods of exacerbation of these symptoms. On days that she feels well, she should be allowed to attend on site school activities. Her health status will require a lengthy recovery period and it is anticipated that remaining on site [at] her school for the remainder of the academic year is strongly advised.

90.    On December 16, the Beacon City School District issued a 504 accommodation plan. In substance, the 504 plan prescribed the same accommodations that Northwood already had in place for J.T.—with the addition of a service dog.

91.    The 504 plan noted that J.T. was being treated for PTSD, POTS, and PNES. These conditions impaired her ability to participate in "academic activities, extra-

curricular activities, [and] attending classes, including difficulty focusing and concentrating in the classroom." As accommodations, among other things, the plan provided that J.T. should have a licensed service dog "with her at all times" to help with "seizure alert and response, light/deep pressure therapy and behavioral interruption." J.T. would also carry a water bottle, snacks, and heart monitor at all times. Contemplating J.T.'s return to Northwood, the plan stated that she would have access "to her residence as needed throughout the day" to rest. As for academics, the plan provided, among other things, that J.T. would receive extended time on tests and assignments and flexibility in scheduling.

### *Northwood Fails to Provide Any Additional Conditions for J.T.'s Return*

92.    Plaintiff's counsel wrote to Northwood's attorney again on December 16, reiterating that Northwood was not exempt from the ADA and requesting that J.T. be allowed to return for the spring semester with her service dog.

93.    Northwood's counsel responded on December 27. Northwood claimed that Dr. Cooper and Wright "still have several open questions about [J.T.'s] medical issues and needs, and they remain uncertain regarding their ability to address those issues." However, the school still did not specify what additional information it needed in order to allow J.T. to return.

94.    Northwood's attorney also inaccurately claimed that a service dog was no longer necessary and that none of J.T.'s records "even mentioned [PNES] as an ongoing health concern, let alone that there is a remaining need for a service dog to be with [J.T.] at all times." In fact, both Dr. Warsy's records and the Beacon City School District's Accommodation Plan indicated that a service dog remained necessary.

95.     On January 5, 2023, plaintiff's counsel asked Northwood's to provide a detailed explanation of the school's conditions for J.T.'s return to campus. Counsel also provided Northwood's attorney with a copy of the Beacon City School District's Accommodation Plan.

96.     Plaintiff's counsel followed up a week later, on January 12, 2023, and was informed that Northwood's counsel intended to meet with Northwood staff the following week and "be in touch afterwards."

97.     Plaintiff's counsel again followed up on January 18 and January 20. On January 22, Northwood's counsel stated that he expected to "have a detailed letter to you by the first part of next week."

98.     On January 24, plaintiff's counsel left a message with Northwood's counsel's assistant, requesting a call back. Northwood's counsel did not return this call.

99.     On January 25, plaintiff's counsel emailed Northwood's counsel, noting that three weeks had passed since the January 5 request and the school "has not provided us with any further information about [J.T.'s] health that it requires in order to allow her back on campus."

100.    A few hours later, Northwood's counsel responded that he would "be in touch with you as soon as possible" and would "explain in detail . . . the basis of Northwood's continuing concerns with [J.T.'s] physical and mental health status and needs, and with whether its staff can adequately support her needs – irrespective of [J.T.'s] request to bring a service dog back with her."

101.    As of this filing, Northwood and its counsel still have not provided the promised explanation.

102.    On Saturday, January 28, Spear emailed Turner and said that J.T. "is not to be returning to school" until Northwood receives "the requested comprehensive medical and psychological evaluation reports." To this day, Northwood has never explained what additional reports it requires.

## FIRST CAUSE OF ACTION
### Title III of the Americans with Disabilities Act
**Failure to Make Reasonable Modifications**, 42 U.S.C. § 12182(b)(2)(A)(ii)

103.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

104.    At all relevant times, J.T. has been a person with a disability within the meaning of 42 U.S.C. § 12102.

105.    At all relevant times, Defendant Northwood School was a "public accommodation" within the meaning of 42 U.S.C. § 12181(7)(J).

106.    Defendant has refused to make a reasonable modification to its generally applicable policy prohibiting students from having dogs on campus to permit J.T. to attend school with a service animal, as required by Title III of the ADA and its implementing regulations. *See* 28 C.F.R. § 36.302(c).

107.    J.T. has suffered and will continue to suffer real and imminent irreparable harm in the absence of an equitable remedy to prohibit Defendant's continuing violations of law.

## SECOND CAUSE OF ACTION
### Title III of the Americans with Disabilities Act
**Denial of Participation/Unequal Benefit**, 42 U.S.C. § 12182(b)(1)(A)(i)-(ii)

108.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

109.    At all relevant times, J.T. has been a person with a disability within the meaning of 42 U.S.C. § 12102.

110.    At all relevant times, Defendant Northwood School was a "public accommodation" within the meaning of 42 U.S.C. § 12181(7)(J).

111.    By excluding J.T. from its campus on the basis of disability, Defendant has subjected J.T. to a denial of the opportunity to benefit from its services, facilities, privileges, advantages, and/or accommodations, and/or afforded her services, facilities, privileges, advantages, and/or accommodations that are not equal to those afforded to other individuals. Defendant has thereby discriminated against J.T. in violation of Title III of the ADA.

112.    J.T. has suffered and will continue to suffer real and imminent irreparable harm in the absence of an equitable remedy to prohibit Defendant's continuing violations of law.

### THIRD CAUSE OF ACTION
### Fair Housing Act
### Failure to Make a Reasonable Accommodation, 42 U.S.C. § 3604(f)(3)(B)

113.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

114.    At all relevant times, J.T. has been a person with a handicap within the meaning of 42 U.S.C. § 3602(h) and an aggrieved person within the meaning of 42 U.S.C. § 3602(i).

115.    At all relevant times, the student dormitories at Northwood School were "dwellings" within the meaning of 42 U.S.C. § 3602(b).

116.    Defendant has refused to make a reasonable accommodation in its generally applicable policy prohibiting students from having dogs on campus to permit J.T. to attend school with a service animal.

117.    J.T. has been damaged by Defendant's unlawful conduct and has suffered and will continue to suffer real and imminent irreparable harm in the absence of an equitable remedy to prohibit Defendant's continuing violations of law.

### FOURTH CAUSE OF ACTION
### New York State Human Rights Law
### Discrimination on the Basis of Disability, N.Y. Executive Law § 296

118.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

119.    At all relevant times, J.T. has been a person with a disability within the meaning of New York Executive Law § 292(21).

120.    At all relevant times, Northwood School has been a "place of public accommodation, resort or amusement" within the meaning of Section 292(9) of the New York Executive Law and an "educational institution" within the meaning of Section 292(40) of the New York Executive Law.

121.    At all relevant times, Northwood School's student dormitories were "housing accommodations" within the meaning of Section 292(10) of the New York Executive Law.

122.    Defendant has refused to make a reasonable modification to its generally applicable policy prohibiting students from having dogs on campus to permit J.T. to attend school with a service animal, in violation of Sections 296(2)(c)(i), 296(14), and 296(18)(2) of the New York Executive Law.

123.     By excluding J.T. from its campus because of her disability, Defendant has withheld from or denied J.T. the accommodations, advantages, facilities or privileges of a place of public accommodation in violation of Section 296(2)(a) of the New York Executive Law and has denied J.T. the use of its facilities in violation of Section 296(4) of the New York Executive Law.

124.     J.T. has been damaged by Defendant's unlawful conduct and has suffered and will continue to suffer real and imminent irreparable harm in the absence of an equitable remedy to prohibit Defendant's continuing violations of law.

### FIFTH CAUSE OF ACTION
### New York State Civil Rights Law § 47

125.     Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

126.     At all relevant times, J.T. has been a person with a disability within the meaning of New York Civil Rights Law § 47(1).

127.     At all relevant times, Northwood School has been a "public facility" within the meaning of New York Civil Rights Law § 47(2).

128.     Defendant has denied J.T. admittance to and/or the equal use and enjoyment of its facilities because J.T. is a person with a disability accompanied by a service dog.

129.     J.T. has been damaged by Defendant's unlawful conduct and has suffered and will continue to suffer real and imminent irreparable harm in the absence of an equitable remedy to prohibit Defendant's continuing violations of law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendant as follows:

1.      Declaring that Defendant's discriminatory practices violate Title III of the Americans with Disabilities Act, the Fair Housing Act, the New York State Human Rights Law, and the New York Civil Rights Law;

2.      Enjoining Defendant, its officers, directors, principals, agents, servants, employees, successors, assigns, and all those acting in concert or participation with them (collectively "Defendant") from discriminating against J.T. on the basis of disability;

3.      Awarding compensatory damages to Plaintiff on her claims under the Fair Housing Act and New York law;

4.      Awarding punitive damages to Plaintiff on her claims under the Fair Housing Act and New York law;

5.      Awarding Plaintiff reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 12188(a)(1), 42 U.S.C. § 3613(c)(2), New York Executive Law § 297(10), and any other applicable law; and

6.      Directing such other and further relief as the Court may deem just and proper.

Dated:      January 30, 2023
               New York, New York

KAUFMAN LIEB LEBOWITZ &
FRICK LLP


_____/s/_____
David A. Lebowitz*
Samuel Barr
18 E. 48th Street, Suite 802
New York, New York 10017
(212) 660-2332

*Attorneys for Plaintiff*


*N.D.N.Y. admission pending